Why don't we start with the first case, 20-3500, Eric Goss v. E.S.I. Cases & Accessories. And I understand that for the appellant, we have Mr. Williman. That's correct, Your Honor. There you go. And I understand you would like to reserve three minutes for rebuttal, is that right? That's correct. Very good. You may proceed. Good morning, Your Honors. Mr. Goss entered into a five-year employment agreement with the defendant, E.S.I., in June of 2017. And he alleges in this case that he was terminated six months later without cause because he got into a dispute with the owner of E.S.I., Elliot Azalay, about an inconsequential issue. The lower court nonetheless determined that Mr. Goss was terminated without, excuse me, with cause because Mr. Goss, according to the lower court, violated the employment agreement by engaging in outside business during his employment with E.S.I. Now, in coming to this determination, we submit that the lower court made two inappropriate resolutions of factual disputes. First is what the parties meant under the agreement by the term engaging in other business. And second, having not analyzed that issue appropriately, determining that the actual conduct alleged was sufficient enough to constitute engaging in other business. Your position is that outside business implies that it has to involve the earning of a livelihood? That would be your colloquial definition of outside business, Your Honor. But to reach that conclusion, you have to insert the words. You have to insert something to make it clear that livelihood, the earning of a livelihood, is involved. I think that's right, Your Honor, but I believe that that begs the question because there are no words inserted with respect to this term. Oh, but that's the point. There are no words inserted, and the only way we get to your conclusion is by inserting some words that are not there, and that's contrary to the rules of contract construction. Well, I think, Your Honor, and I'll maybe jump to the main point of the brief, is that we, it's our position that this term on its face is ambiguous in the context both of this contract. I don't see how one can say it's ambiguous. I mean, it seems perfectly obvious from these facts that not necessarily before he was fired, but after he was fired when all the data came in, it was clear that your client was engaged in outside business. I mean, I don't know what else you could do in this case. Well, I think, Your Honor, there are two, well, I would say this. With respect to the term engaged in outside business, I do think under the context that the term is ambiguous in this case for the two reasons. One, if you're looking at the term and you're describing it and it's— And it went back and forth on what he could do and what not could do before the thing was signed, so that even if one looked, it would become perfectly clear what it meant. But the language itself, I mean, I don't know how to read it in any other way. Well, Your Honor, I appreciate you mentioning the back and forth that they went through prior to signing the agreement, because what Mr. Goss had attempted to include in the agreement was a provision that would allow him to manage his other businesses, meaning Intercon and ESI, operate them. And Mr. Azoulay said, no, you can't do that. I don't want you doing this management of these businesses. And he said, you can't engage in these outside businesses. But at the same time that these conversations were happening, there were conversations occurring, and this is reflected in the record both before and after the employment agreement started, where the parties both knew very well that in order to divest themselves from SGA and in order to continue to operate as the owner of Intercon, which he had the right to do under the contract. Was there an integration clause that said that there were no oral agreements? The quality contract. I may be confusing this with another case, but I thought I recalled that there was a clause that says there are no oral agreements. This is the entire contract. Well, I think that's right, but the issue is... Oral contracts would supersede the integration clause? Your Honor, what I'm saying is that the discussions that were had around this time informed the party's intent with respect to the meaning of the term, engaging in outside business. So what I'm saying is that... Can I ask you this then? Putting aside, and I understand your argument about outside compensation. You would agree that the emails that were exchanged with your client, including the ones that he sent, with respect to SGA, certainly related to the conduct of commercial business or commercial activity. Putting aside the notion of whether he was ever paid for it, do you agree with that? The email... I agree that the email is related to commercial activity. Okay. Where... I apologize, Your Honor, but where I think the critical distinction is, is that not only because he didn't get remuneration for it, but also because of the party's understanding of the meaning of that term, it did not constitute him engaging in outside business pursuant to the terms... Because it was de minimis? Or because that was the kind of commercial activity he was allowed to as a matter of a side verbal agreement? Not a side verbal agreement, Your Honor. It is, again, when you look at... What always prohibited him from doing is engaging in business. And so the lower court, we submit, didn't do the appropriate analysis... Let's say that there was another company the parties had never talked about, okay? He had a side gig with Google. And he came in here and he said, yeah, you know what, I got hired as a programmer for Google, but I talked to Mr. Azzalea and he knew about this and it was fine. Is it your view that that would also mean that he had not violated the agreement? No, because I don't believe that to be the case, because I believe that the term employment is a term that is not ambiguous in the agreement. I think the only ambiguity here with respect to this, and the only issue here in the case with respect to the terms of the agreement are what does it mean to be prohibited from engaging in outside business? And I think that the parties understood that Mr. Azzalea... So you're willing to say that employment might apply even if there was no pay, although there's nothing about that here, but engaging in outside business involves pay. That's a remarkable thing. Why do we read what you'd have us read in employment, what you agree one would read in employment, and yet tell us that that doesn't apply to outside business? Traditionally, employment would involve compensation as well, Your Honor. So, I mean, to the extent... The example that the presiding judge gave you was employment that did not. And you said, oh, well, but that's different because that's employment. So what you told him was exactly what I said to you, that employment would still be employment if it wasn't paid, and that outside business instead was only outside business if it was paid. I just don't understand the language. Just to respond very briefly to that, I was perhaps reading into the hypothetical a more traditional employment relationship with outside entity where someone would be spending significant amounts of time. That would clearly be a breach of this agreement because employment, I believe, is a term that is readily and legally definable. Engaging outside business is not, and there's no case law that defines that term that any of the parties have cited. So, counsel, you've reserved three minutes. If you'd like to, you may use some of that now, or you can hold on to that for rebuttal. I'll hold on to that for rebuttal, Your Honor. Okay. Thank you. Very good. We'll hear from opposing counsel. We have Mr. Lenahan. Yes. You have 10 minutes. Thank you very much. I believe that the sentiments that the panel has been expressing so far are exactly correct, and that the district court got this exactly correct when it held that Mr. Goss clearly breached the terms of the covenants in his employment agreement, which state he shall not accept any employment in any capacity whatsoever. So sticking with that first thing that he is prohibited from doing, he admitted under oath that he accepted employment and was employed by Intercom Development, LLC. He admitted to the IRS that he materially participated in Intercom Development, LLC. Well, is material participation really necessarily the same as employment? I'm just wondering whether this is really your strongest argument. Well, I think it's a strong supporting argument, Your Honor, because material participation is defined, and we have it defined in the confidential appendix, page 220, and this is from the IRS. It includes a litany of things, but most specifically it says work you did as an investor, that is someone who would just receive passive income, is an activity that's not treated as participation unless you were directly involved in the day-to-day management or operations of the activity. Can I ask you to focus for a minute on the, just keeping it narrow, the SGA emails that went back and forth. Putting aside Intercom, because we know that you agreed that he could maintain an ownership interest in Intercom, and one could debate what are the boundaries of the necessary activities of an owner, but talk about SGA. I understand your view is that SGA activities were completely off the table, clearly, under the contract. Could you tell us why you argue that and what your evidence is on that point? Absolutely, Your Honor. So aside from just the plain language of the contract, which we do not believe is remotely ambiguous, if you wanted to get into the background, the whole reason that ESI hired Mr. Goss in the first place is because it had a- Let's not get into the background. Why don't we just stick with the terms of the contract? The contract- The terms of the contract and the specific evidence that you would put forward as having violated that particular term. Why don't we start with what is the particular covenant that you claim he violated by engaging in the SGA activity? Where in paragraph 1 of the agreement, it states that Mr. Goss shall not engage in any outside business or employment. And how do you define employment? I'm sorry, outside business, because your adversary says, look, business generally means you get money for something, right? Anything else is a hobby. Well, I would disagree with that. I would disagree with that for several reasons. SGA was getting compensated for this, and Mr. Goss claims he didn't get any compensation for that, but that does not change the fact that it's a business activity. And the entire purpose of this agreement, the entire purpose of this paragraph, where it says he will devote his full time to ESI, is that he's not going to do work for somebody else. ESI didn't care if he was making money one way or another. He was allowed to own Intercom. He was allowed to be a passive owner and get outside flows of income. So your argument is that income is not what this was focused on. It was focused on his attention to his work for this company is against that, and that the language is clear enough about that. Absolutely, Your Honor, yes. So... Is there a de minimis exception? Let's say that you had found one email that Mr. Goss had sent to someone at whatever, Kmart, on business time where he said, I don't know, pick one of the emails he said, hey, this is how we're going to price tarps or whatever it is. And that was the only evidence you had found, in my hypothetical, that he was engaging in anything constituting outside business. Under your view, would ESI have had the right under the contract to terminate for cause? Yes, Your Honor. That would still be a violation of the heavily bargained for plain language in the agreement. That would be a material breach? One email? I believe that it could be. However, that's not the issue that... I'm packed off to it could be. I mean, it has to be a material breach, right? Excuse me. I said I believe it would be, or I meant to say I believe it would be. However, with all due respect, that's not the issue that we have here. We have a literal ream. I mean, hundreds of emails that he sent during his six months of employment, starting the very second day of employment. He signed this agreement on June 19th, 2017. He was conducting outside business by June 20th, 2017. And that is that confidential appendix 262. And then it runs all the way through confidential appendix 486. So what you're saying is that absolute language is absolute regardless, but that this isn't the case. I'd suggest to you that absolute language is rarely absolute. I mean, I can give you any number of examples where people would not be violating the speed limit if they went more than the speed limit to save hundreds of lives. It can be as absolute as you want, but that's not you're saying it doesn't matter. I am saying it doesn't matter here. And I'd also like to focus the court on a second thing that is completely ignored in appellant's brief. And that is another reason that, another basis for a four cause termination is if Mr. Goss participated in any fraud, dishonesty or unethical business conduct. We have Mr. Goss admitting under oath the deposition that he lied to ESI CEO when ESI expressly asked him point blank, how many hours a week do you spend on intercom development? He said, I don't spend any. Mark, his brother, Mark Goss handles everything. He admitted under oath that that was a lie. Given as a reason for terminating him at the time. At the time? Yeah, I mean, is this after the fact? Mr. ESI believed. He was terminated for breaching the contract by engaging in outside employment, right? He wasn't terminated for engaging in fraud or was he? He was terminated for engaging in outside employment, which they believed he was lying to them about. So that is the fraud. That is the dishonesty. At a minimum, it's dishonesty and it's unethical business practices. And he admitted under oath that he lied about it. And that's what he was doing the entire time. He was lying. He was covering his tracks so he wouldn't have been caught. And even in this litigation, he didn't really admit that he was lying, right? He was never asked, were you lying? And he said, yes. He was asked, let's just be precise about what the testimony is. And then I can read it. But let's just distinguish between what he said and your characterization of it, right? Absolutely. I don't believe he said he lied. If the question was, were you doing work? And he said, yes. And then you're saying, and he had also told somebody else something else, which is inconsistent. That shows that he lied. At his deposition, he was asked, you write, hello, Elliot, I don't spend any time on intercom development. Was that a true statement as of October 11th, 2017? His answer, no. OK. And he sent an email a few minutes later to Kmart saying, everything regarding SGA, send to my brother. The very next day, the very next day, he was back emailing Kmart from his SGA account, conducting business. Five days later. Without copying his brother? Without copying, or excuse me. I don't want to misstate the record, so please let me look very quickly. He did copy his brother, but Mr. Goss was the one who said, see attach set up for tarps, and then sent an entire pack about tarps. And then the next day, excuse me, on October 4th, which would be barely a week later, he was emailing Kmart, or Sears, which owned Kmart at the time, without his brother on it. And that would be from Confidential Appendix 255 to 257. So throughout the entire time of his employment, he had been conducting outside business. He had accepted outside employment, which he was not allowed to do in any capacity whatsoever, the exact language. And he'd been lying about it. So was he being paid for that or not? Was he, he was being paid for intercom. And he. As an owner? Well, no. We would contend he was being paid for the work he did by his material participation. Yeah. But that's harder to say whether he was being paid as an owner or whether he was being paid. Well, respectfully, I disagree. I mean, was he drawing a salary or was he getting profits? I suppose is another way of asking it. He was receiving profits, but there was no, as demonstrated on Confidential Appendix 215, his Schedule C from 2017, there was no contract labor. There were no wages. Everything was going to Mr. Goss. He was doing the work. He admitted at deposition he was employed by intercom. He admitted he was employed by intercom. But even if he wanted to say, well, maybe he took that as an owner, he was engaging in the business. He was allowed to be a passive owner. He was allowed to get distributions. He wasn't allowed to do the work. He had to focus on his work at ESI. He did not do that. Instead, he spent the entire time running a side business, confident that he could hide it, would not get caught, and enjoy the windfall salary that he was getting from ESI while engaging in his own side business. If the panel has any other questions, I'm happy to address them. No.  Thank you very much for your time, Mr. Blumenthal. Mr. Blumenthal, you have reserved three minutes for rebuttal. Thank you, Your Honors. I believe the end of Mr. Lenahan's statements there really put a pin on how much of a factual dispute exists here, because there is no evidence in the record, much less evidence that could possibly warrant summary judgment, that Mr. Goss was simply running side businesses while not doing his work for ESI, hoping to get a paycheck without doing anything. And there's a lot of evidence in the record, including third-party affidavits from Mark Goss, saying that Mr. Goss was focused on his work with ESI at all relevant times. Well, but that's not really. I think I understand your point, that that's not particularly, that there would be a factual dispute about whether he was performing work for ESI, but that's not the question, right? The question is not, can he be terminated because he was, even if he was violating the contract, he was also doing work for ESI, right? The question is, was he doing outside business? I take your point that that's the only question here, right? So the issue here, and I want to talk about SGA, because the issue is only whether or not there's a dispute of fact as to whether, based on the party's understanding of the agreement, he was engaged in outside business. And Mr. Goss owned SGA before he joined ESI. He divested himself from SGA. No, I don't think it's whether understanding of the party. It's whether the language of the contract, you know, when you're dealing with contracts, you only go to look at deeper understanding of the parties if the language of a contract is ambiguous. And so you properly began by saying that the language is ambiguous. But that's the issue. Your Honor, if the language is not ambiguous, that helps us, because engaging in business means, and by the definitionary sense, if you're looking at it in the context of commercial activity, doing something for your livelihood. I mean, we've quoted this in our briefs. That's the definition in the Merriam-Webster Dictionary. So if there's no ambiguity, then that only inheres to our benefit, because he received no income from SGA. He divested himself from SGA. We have five affidavits from clients who all testified in their affidavit that he told them to deal with Mark Goss. That doesn't really help, right? I mean, if they come in and you have five clients who said, I was told never to work with them, but we have emails showing that he worked with people, but who cares what they said, right? Well, here's why it matters. Because if you break the 77 email chains, hundreds of emails, that's not accurate when you're talking about SGA. Of the 77 email chains, only about 30 of them over a six-month period have to do with SGA. Many of them, Mark Goss was copied on, and only five of them, and give or take one or two, because I don't want to get it wrong, only five of them were initiated at all by Mr. Goss, and only after a customer, who, by the way, he had dealt with for 20 years, had reached out to him to say, hey, can you send this? Can you do this? He fires something off, and that's it. He spends a total, like, no time at all, practically, doing this work. And under no, if I said to anyone in this courtroom, I'm going to go leave this courtroom, and I'm going to start engaging in some business, no one would think that I'm sending an email every three or four days to follow up from a customer that's 20 years, a customer of mine, that ultimately transitioned that to my brother, and there's not one SGA email from Mr. Goss' SGA email account after early October. So I think we have the parties' arguments. We thank you both very much for your arguments, very helpful. We will take the case under advisement. Thank you, Your Honor. Thank you both.